**Samuel KEENE and Marilyn Keene, Appellants–Plaintiffs,**

v.

**ELKHART COUNTY PARK AND RECREATION BOARD, Appellee–Defendant.**

No. 20A03–0006–CV–205.

Court of Appeals of Indiana.

Dec. 14, 2000.

Rehearing Denied Feb. 27, 2001.

Lynn M. Butcher, South Bend, Indiana, Attorney for Appellants.

John William Davis, Jr., Davis & Roose, Goshen, Indiana, Attorney for Appellee.

## OPINION

BAILEY, Judge

### Case Summary

Appellants Samuel and Marilyn Keene (the Keenes), Plaintiffs below, present this interlocutory appeal of the trial court's entry of partial summary judgment in favor of appellee-defendant Elkhart County Park and Recreation Board (the Board). We reverse.

### Issue

The issue certified by the trial court for interlocutory appeal pursuant to Indiana Appellate Rule 4(B)(6) is:

When a deed contains the statement: '[A]s [a] part of the consideration for the sale and purchase of this land, it is agreed that [ ] grantee [ ] will construct and [forever] maintain [a proper] bridge [over] the canal ..., which bridge [ ] shall be [one] constructed and maintained [ ] as to provide safe and secure crossing over said canal for all farming operations [upon land now owned by [the grantors] ]', must the grantee's successor in interest construct and forever maintain the bridge to the standard and

specification that provided safe and secure crossing for farming operations at the time of the conveyance (here, in 1924), or shall the standard and specifications for the bridge be changed as farming operations change over a period of time?

(R. 108.)[1]

## Facts and Procedural History

On October 16, 1924, Omer and Pearl Darr (the Darrs) conveyed a 100 foot wide strip of land, running from one end of their Elkhart County farm to the other, to the Interstate Public Service Company (IPSCO). Conveyance of the strip divided the Darrs's land into two separate parcels. IPSCO apparently intended to dig a hydraulic canal through the strip of land, and through similar strips obtained from adjoining property owners, to support the Benton dam and hydroelectric generation facility adjacent to the Elkhart River. Construction of the canal would prevent the Darrs from accessing the rear of their two divided parcels.

The deed by which the Darrs conveyed the strip contained the following language:

As a part of the consideration of the sale and purchase of this land, it is agreed that grantee [IPSCO] will construct and forever maintain a proper bridge over the canal to be constructed over and above said lands, which bridge shall be one constructed and maintained as to provide safe and secure crossing over said canal for all farming operations upon land now owned by first parties [the Darrs] adjacent to the lands herein described and grantors [the Darrs] reserve for themselves and their grantees, immediate and remote, a right of way over and across said herein conveyed lands to and from their fields on either side of said herein conveyed real estate. Said grantees as a part of the consideration for the sale and purchase hereof, agree to properly fence the lands by a proper partition fence between the lands herein conveyed and the lands of the grantors, which fence, or fences shall be so constructed as to not obstruct grantors or their grantees in the free use of said bridge at all times, and it is further agreed that said bridge shall be constructed at such place as may be designated by grantors and shall be constructed within thirty (30) days after water is turned into said canal.

. . .

The conditions herein set forth to be done and performed by said grantee shall be a burden upon and run with the title of the land hereby conveyed.

(R. 11.) IPSCO built a bridge over the canal, joining the Darrs's divided parcels. In 1932, the strip was conveyed to the Northern Indiana Public Service Company (NIPSCO),[2] which in turn sold the strip to the Board in 1970. The Keenes eventually acquired the parcels owned by the Darrs. The bridge was apparently maintained over the years by IPSCO and its successors without complaint or objection, and the property originally owned by the Darrs has apparently remained a farm.

On July 19, 1996, the Keenes filed a complaint against the Board in the Elkhart County Superior Court, alleging that pursuant to the deed language quoted above, the Board and its predecessors in title were obligated to construct and forever maintain a bridge suitable for farming operations, and that the bridge was no longer suitable for the Keenes's farming needs because the Board had failed to make nec-

---

1. We have revised the issue certified by the trial court to reflect the actual text of the deed in question.

2. The Board states in its brief that IPSCO changed its name to the Public Service Company of Indiana (PSCI), and conveyed the strip to NIPSCO by a deed that did not men-

tion any requirement regarding construction or maintenance of the bridge. The Board presents no argument that this affects the Board's obligation to fulfill the obligations set forth in the original deed, and concedes that it is bound by the conditions in the deed.

essary repairs and alterations. The Keenes asked the court to direct the Board to make these repairs. The Board responded by claiming that the Keenes's easement, and the Board's obligation to maintain the bridge, had been extinguished by virtue of a prior action quieting title to the canal land, including the strip dividing the Keenes's property, with the Board. The trial court rejected the Board's argument, but certified the issue for interlocutory appeal. In an unpublished memorandum decision, we affirmed the trial court and ruled that the quiet title action did not extinguish the Keenes's easement or the Board's obligations under the original deed.

The Keenes then filed a motion for partial summary judgment claiming that the deed language obligated the Board to improve and maintain the bridge such that the bridge could support reasonable modern farming operations. The Board responded by filing its own motion for partial summary judgment on the issue, claiming that it was only obligated to maintain the bridge in a manner sufficient to support farming operations as they existed at the time of the conveyance. The court agreed with the Board, and issued an order concluding that the "bridge was sufficient in the 1920s, when built, and the original specifications remain the standard for maintenance today." (R. 98.) The Keenes asked the court to certify the question at issue for interlocutory appeal pursuant to Indiana Appellate Rule 4(B)(6), which the court did. The Keenes then petitioned this court to accept their appeal. On July 7, 2000, we granted the Keenes' petition, and accepted jurisdiction of this matter.

3. Rather than certifying its order on partial summary judgment for our review, the trial court certified the specific issue identified above. Although Appellate Rule 4(B)(6) requires the certification of orders, our supreme court has confirmed that the often-helpful certification of specific questions is appropriate, so long as it is clear from the record what particular order is affected. *Budden v. Board*

## Discussion and Decision

### *Standard of Review*

The Keenes appeal the court's entry of partial summary judgment in favor of the Board.[3] Pursuant to Rule 56(C) of the Indiana Rules of Trial Procedure, summary judgment is appropriate when there are no genuine issues of material fact and when the moving party is entitled to judgment as a matter of law. This case involves the interpretation of the meaning of the deed by which the Darrs conveyed their strip of land to IPSCO, and there are no disputed material facts. Thus, since the construction of the terms of a written instrument, and the determination of whether summary judgment is appropriate when material facts are not in dispute, are both pure questions of law for a court, our standard of review is *de novo. See Bradley v. City of New Castle*, 730 N.E.2d 771, 779 (Ind.Ct.App.2000), *reh'g denied; Barrington Management, Inc. v. Paul E. Draper Family Ltd. Partnership*, 695 N.E.2d 135, 140 (Ind.Ct.App.1998).

### *Analysis*

Real covenants are agreements relating to real property that obligate a party to do or not to do a particular act. *Columbia Club, Inc. v. American Fletcher Realty Corp.*, 720 N.E.2d 411, 417 (Ind.Ct. App.1999), *trans. denied.* If a covenant runs with the land, it is enforceable by or against those who have succeeded to an estate in real property to which the covenant relates. *Noblesville Redevelopment Comm'n v. Noblesville Associates Ltd. Partnership*, 646 N.E.2d 364, 368 (Ind.Ct. App.1995), *vacated on other grounds*, 674 N.E.2d 558 (Ind.1996). A covenant runs with the land when (1) the parties intend it

*of School Comm'rs of Indianapolis*, 698 N.E.2d 1157, 1166 n. 14 (Ind.1998). In this case, the specific question certified by the trial court and accepted for appeal by this Court plainly relates to the court's order on the parties' cross-motions for partial summary judgment, and the parties treat the resolution of this question as determinative of their motions.

to run, (2) the covenant touches and concerns the land, and (3) there is privity of estate between subsequent grantees of the original covenantor and covenantee. *Moseley v. Bishop,* 470 N.E.2d 773, 776 (Ind.Ct.App.1984).

The parties here agree that the deed by which the Darrs conveyed the strip of land to IPSCO included a covenant that bound IPSCO to build and maintain a bridge over the canal, and there is no dispute that this covenant runs with the land. The parties accordingly accept that the Board, as IPSCO's successor in interest, is subject to the terms of the covenant, and that the Keenes, as the Darrs's successors, are entitled to enforce the covenant. The parties differ, however, as to their respective interpretations of the Board's current obligations under the covenant.

■ The object of deed interpretation is to identify and implement the intent of the parties to the transaction as expressed in the plain language of the deed. *Windell v. Miller,* 687 N.E.2d 585, 589 (Ind.Ct.App.1997). We read the language of real covenants in the ordinary and popular sense, and not in a technical or legal sense. *Noblesville Redevelopment Comm'n,* 646 N.E.2d at 369. If the terms of the deed are not ambiguous, we apply them according to their clear and ordinary meaning. *Windell,* 687 N.E.2d at 589. We presume that the parties intended for every part of a deed to have some meaning, and we favor a construction that reconciles and harmonizes the entire deed. *Hemenway Memorial Presbyterian Church v. Aigner,* 443 N.E.2d 93, 94 (Ind. Ct.App.1982).

■ The Keenes claim that the bridge originally built by IPSCO is no longer suitable for modern farming operations, and argue that the Board is, and will forever remain, obligated under the covenant to improve, and possibly rebuild, the bridge so that it will accommodate their current farming needs. The Board contends that IPSCO discharged its obligation to construct the bridge, and that the only remaining duty devolving on the Board is to maintain the current bridge so that it will continue to accommodate farming operations as they existed at the time of the original transaction. The Board's positions, however, are inconsistent with the intent of the parties as clearly expressed in the plain language of the deed, and are at odds with the case law.

The terms of the deed, and of the covenant in question, are not in themselves ambiguous. It is apparent that the Darrs's property was a farm, and that the proposed canal would dissect the property, leaving one portion of the farm landlocked. The deed recites that the Darrs agreed to convey the strip of land to IPSCO in partial exchange for IPSCO's promise to "construct ... a proper bridge" over the planned canal. The term "construct" is defined as "to put together the constituent parts of (something) in their proper place and order; to build; form; make." Webster's New International Dictionary (2nd ed. 1934). The term "proper" is defined as "appropriate" and "suitable." *Id.* To be "proper," the bridge must have been appropriate or suitable for some purpose. Here, the term plainly relates to the subsequent phrase regarding IPSCO's obligation to construct the bridge so that it would "provide safe and secure crossing over said canal for all farming operations upon land now owned by [the Darrs]." IPSCO accordingly agreed to build a bridge appropriate and suitable for the safe and secure crossing of all the Darrs's farming operations.

IPSCO also agreed to "maintain" the bridge "forever." The word "maintain" means "to hold or keep in any particular state or condition, esp. in a state of efficiency or validity; to support, sustain, or uphold; to keep up; not to suffer to fail or decline." Webster's New International Dictionary (2nd ed. 1934). As with its duty to construct the crossing, IPSCO specifically promised to maintain the bridge "as to provide safe and secure crossing ...

for all farming operations upon land now owned by [the Darrs]." The term "forever" indicates that this obligation would run in perpetuity. IPSCO's maintenance obligation thus plainly goes beyond a simple duty to keep the bridge from falling into the canal. Rather, pursuant to the plain language of the deed, the maintenance obligation embodies the perpetual duty to keep up the bridge in a state or condition of appropriateness and suitability for use in connection with all farming operations to be performed on the landlocked parcel.

The deed contains no language supporting the Board's proposed limitation on its obligations. Rather, the deed speaks in general, open-ended terms of an obligation to build and forever maintain a bridge that will be suitable to accommodate all farming operations to be performed on the land. The use of the word "all," meaning "every member or individual component of," Webster's New International Dictionary (2nd ed. 1934), to describe the kinds of farming operations contemplated by the parties, indicates that the parties did not intend to limit IPSCO's obligations to farming operations of a particular kind or extent. Further, when the phrase "all farming operations" is read in conjunction with the perpetual nature of the obligations imposed by the covenant, it is clear that the parties did not intend that IPSCO's obligations would be fixed to the type or extent of farming operations in existence at any particular time. We accordingly conclude that the Board's maintenance obligation under the covenant includes the perpetual duty to ensure that the bridge over the canal remains sufficient to accommodate the farming operations performed on the Keenes's land.

The Board further agues, and the Keenes do not dispute, that a continuing obligation to maintain the bridge such that it will remain perpetually useful for the Keenes's farming operations will of necessity require the Board to improve and even rebuild the bridge. The Board maintains that the covenant contemplates the construction of a single bridge, and claims that this obligation was discharged when IPSCO built the current bridge shortly after the conveyance. The Board apparently reasons that IPSCO's construction of the bridge limits the Board's remaining obligation to that of simple maintenance. It is settled, however, that a perpetual maintenance obligation may include the obligation to rebuild as well as to repair.

In *Pittsburgh, C., C. & St. L. Ry. Co. v. Wilson,* 34 Ind.App. 324, 72 N.E. 666 (1904), we were asked to determine whether a railroad, which was subject to a real covenant to make and maintain a "farm crossing" over the railroad's line of track that divided a landowner's farm, was obligated to rebuild the crossing for the landowner after the original crossing was destroyed. We had little difficulty concluding that the railroad's obligation to provide a crossing over the railway so that the landowner could access all of his property necessarily included the obligation to replace the crossing once it had been rendered useless. *Id.* at 668. More recently, in *Moseley,* 470 N.E.2d 773, we were called upon to decide whether one party's covenant to "place ... and permanently maintain drain tile of sufficient capacity to furnish adequate let-out for drainage" from the other party's land obligated that covenantor to maintain the drain and its tile beyond the useful life of the tile. *Id.* at 779. We explained that unless the parties to a covenant indicate that terms of the covenant are limited in duration, a real covenant typically endures as long as the estate with which it runs. *Id.* We noted that the terms of the covenant in that case stated that the covenantor was to maintain the tile permanently. We also noted that continued maintenance of the drain was vital to keeping the covenantee's land arable. *Id.* Given the perpetual nature of the covenant in question and the importance of the drain to the covenantees's enjoyment of their land, we concluded that the parties intended that the covenantor's duty to maintain the drain and its tile

extended beyond the useful life of the original tile. *Id.* In other words, we determined that the covenantor might be required to install new tile as part of its permanent maintenance obligation. *See also Rhodes v. Mummery,* 48 Ind. 216, 1874 WL 5865 (1874) (holding that the word "maintained" "may properly be construed to require a fence to be rebuilt as well as repaired."); *Ponsler v. Union Traction Co. of Indiana,* 76 Ind.App. 616, 132 N.E. 708, 709–710 (1921) (same).

The same reasoning applies here. The Board is obligated to maintain a bridge over the canal in a state of usefulness for all farming operations to be conducted on the adjacent land in perpetuity. This obligation necessarily contemplates the possibility that a new bridge might eventually be needed, and the covenant places the burden upon the Board, as owner of the canal lands, to supply the bridge.

▇ The Board claims that if it is required to maintain the bridge so that it will be suitable for use in connection with whatever farming operations are being conducted on the Keenes's property at any given time, the Board will be forced to improve or rebuild the bridge at the whim of the Keenes, and will accordingly be subjected to a contractual obligation far too uncertain to be enforceable. It is true, as the Board notes, that a court should not direct the specific performance of a contract that is incomplete with respect to its essential elements, see *Workman v. Douglas,* 419 N.E.2d 1340, 1345 (Ind.Ct.App. 1981), because "enforcement of a writing which is incomplete or ambiguous creates the substantial danger that the court will enforce something neither party intended." *Wolvos v. Meyer,* 668 N.E.2d 671, 675 (Ind.1996) (citations omitted). It is also true, however, that

> where the contract does contain the essential elements it is not incomplete or indefinite because it fails to express in terms some matters concerning the performance of the contract which are usually found in such instruments and calculated to facilitate the attainment of its object, or does not include other nonessential provisions which might properly have been incorporated in the agreement. Such matters may be left open for future specification without destruction of the contract or depriving a party remedy for its enforcement.

*Id.* at 678 (quoting *Ray v. Wooster,* 270 S.W.2d 743, 751–752 (Mo.1954)).

Here, the intent of the parties is unmistakable, and the essential elements of the agreement are clear. The parties agreed that IPSCO and its successors would build and forever maintain a bridge sufficient to accommodate all farming operations to be conducted on the adjacent farm property by the Darrs and their successors. The fact that the parties did not agree upon a fixed schedule of maintenance or decide in advance the exact specifications of future improvements does not render the covenant too uncertain to be enforceable. The respective parties have operated under the covenant in the absence of more specific terms without complaint from the date of the original conveyance until the present dispute arose, and we are confident that the covenant will remain sufficiently definite to guide their obligations in the future.

▇ We are mindful that it may seem inequitable to require the Board to fulfill the potentially expensive obligations originally taken on by IPSCO, as the Board may not derive significant benefit from its ownership of the canal lands, at least not commensurate with the benefit presumably derived by IPSCO in connection with its original use of the canal in connection with its hydroelectric generation operations. Nevertheless, one who takes real property subject to covenants running with land set forth in a deed is bound by those covenants as if he were a party to the original transaction. *See Midland R. Co. v. Fisher,* 125 Ind. 19, 24 N.E. 756, 756–758 (1890) (noting that "a deed-poll, when accepted by the grantee,

becomes the mutual acts of the parties."). Although the Board has disputed the scope of its obligations under the covenant, it does not take issue with its duty to fulfill those obligations. Moreover, covenants should not be interpreted contrary to their underlying purpose and legal effect simply because the interpretation may reduce further litigation or provide better protection to one party. *Coursen v. Canfield,* 21 N.J.Eq. 92, 100, 1870 WL 5154 (N.J.Ch. 1870). We have previously indicated that the potential expense associated with fulfilling one's obligations under a real covenant should not affect a party's obligation to perform. *See Pittsburgh, C., C. & St. L. Ry. Co.,* 72 N.E. at 668 (noting that "while proper approaches to the new crossing will be somewhat expensive, yet approaches may be made, upon the construction of which the appellees will be supplied with a crossing which will answer the requirement of the contract."). We are bound to give effect to the clear intent of the parties as expressed in the plain language of the deed. The deed plainly shows that the parties intended that the owner of the canal lands, currently the Board, would be obligated in perpetuity to furnish a bridge suitable for use in connection with the farming operations being performed on the adjacent property.

Reversed and remanded for further proceedings consistent with this opinion.

RILEY, J., and BARNES, J., concur.